IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Martha Pace, | ) | C/A No.: 1:10-3256-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

       A.     Procedural History

       On August 16, 2007, Plaintiff filed an application for DIB under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433. Tr. at 97–99. In her application, she

alleged her disability began on February 24, 2007. Tr. at 97. Her application was denied initially and upon reconsideration. Tr. at 66–67. On August 14, 2009, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 30–55. The ALJ issued an unfavorable decision on October 21, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 21–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on December 23, 2010. [Entry #1].

Plaintiff filed a second DIB application on October 22, 2009 and was ultimately awarded benefits beginning on that date. Tr. at 2.

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 56 years old at the time of the hearing. Tr. at 33. She completed the ninth grade and her past relevant work ("PRW") was as a vice-president of operations for a mortgage company. Tr. at 33, 124. She alleges she has been unable to work since February 24, 2007. Tr. at 97.

2.      Medical History

Plaintiff was first seen at Travelers Rest Family Practice ("TRFP") on October 11, 2001. Tr. at 312. She was treated consistently through 2004 for general medical conditions, as well as chronic asthma. Tr. at 298–312. She was repeatedly advised to

quit smoking. Tr. at 306–08. On September 25, 2002, an x-ray of Plaintiff's right knee demonstrated osteopenia and moderate cartilage loss. Tr. at 285.

On May 27, 2005, Plaintiff saw James W. Hudson, MD at TRFP for severe shoulder pain. Tr. at 297. She was diagnosed with muscle strain of her neck and referred to Dr. Mina for evaluation. *Id.* At a follow-up appointment on June 21, 2005, Dr. Hudson noted radiating pain, stiffness, and numbness in Plaintiff's neck. Tr. at 296. Dr. Hudson diagnosed cervical myelopathy. *Id.*

On June 22, 2005, an MRI of Plaintiff's cervical spine revealed a very large extruded disc at C6-7, toward the right. Tr. at 282.

Christie B. Mina, M.D., of Piedmont Neurosurgical Group, initially evaluated Plaintiff on July 1, 2005 for neck and right upper extremity pain. Tr. at 171. Following physical examination, history, and review of Plaintiff's MRI, Dr. Mina diagnosed Plaintiff with right C6-7 herniated nucleus pulposus and recommended surgical intervention. Tr. at 170. Dr. Mina noted Plaintiff had a history of asthma and had smoked one pack of cigarettes per day for 30 years. Tr. at 171.

On July 19, 2005, Plaintiff underwent spinal surgery for a complete anterior cervical diskectomy with spinal cord and nerve root decompression at C6-7. Tr. at 273–75. She also had anterior arthrodesis with allograft ring and premier anterior cervical plating. *Id.*

At a follow-up examination on August 17, 2005, Dr. Mina noted Plaintiff was doing extremely well and that her preoperative symptoms had completely resolved. Tr.

at 172.  Plaintiff complained of some continued stiffness and a tired feeling in her neck and shoulder muscles.  *Id.*  Dr. Mina released Plaintiff to normal activity, including work, without restrictions.  Tr. at 172, 267.  At a subsequent visit on October 17, 2005, Plaintiff reported that her neck stiffness had improved and that she was doing well back at work.  Tr. at 173.  Plaintiff's only complaint was some "popping and cracking" sounds in her neck.  *Id.*  Dr. Mina stated Plaintiff was doing well enough that she did not need any further follow-up visits.  *Id.*

Plaintiff was admitted to the hospital on February 24, 2007 for a right tibia and fibula fracture following a motorcycle accident.  Tr. at 177, 202.  She reported a history of asthma and smoking, but denied any history of anxiety or depression.  Tr. at 208.  She required surgery, which consisted of intramedullary nailing of her right tibia and plating of her fibula.  Tr. at 177, 188–89.  She was discharged on February 28, 2007 with instructions for no weight bearing on her right leg.  Tr. at 177, 184.  She was given Lortab for pain and advised to seek follow-up evaluation with an orthopedist in two weeks.  *Id.*

Examination on March 16, 2007 by T. Davenport Spires, MD, revealed well-healed wounds, good profusion to Plaintiff's toes, and a neurovascularly-intact right fibula and tibia.  Tr. at 240.  Plaintiff stated her pain was controlled with medication.  *Id.*  X-rays showed good alignment of fracture fragments unchanged from postoperative films, good apposition of fracture fragments, and early callus formation.  Tr. 240, 242–43.

On April 11, 2007, Plaintiff was not bearing weight on her right side. Tr. at 239. Her cast was removed and her incision was noted to look well healed. *Id.* Right ankle and tibia/fibula x-rays revealed unchanged overall appearance of the fixation apparatus from March 2007, and "some" distraction of the fracture fragments that was essentially unchanged from March 2007. *Id.* The doctor interpreted the x-rays as showing good alignment and healing. Tr. at 239, 244. Plaintiff was instructed to begin weight bearing as tolerated. Tr. at 239.

At a follow-up visit on June 27, 2007, Plaintiff reported weight bearing without any assistive devices, but said she still felt like she had a significant limp. Tr. at 238. Dr. Spires noted that examination of the right foot revealed dorsiflexion to just past neutral, good plantar flexion, good foot perfusion, and subjectively decreased sensation. *Id.* Right tibia x-rays revealed slight displacement of a fracture fragment without obvious loosening of orthopedic hardware, and were interpreted as showing good fracture healing Tr. at 238, 241.

On August 22, 2007, Plaintiff reported she was bearing weight on her right leg without any assistive devices. Tr. at 237. She reported some pain after extended periods of standing that resolved when she elevated her leg and mild foot swelling that resolved upon waking. *Id.* Dr. Spires advised Plaintiff to continue weight bearing as tolerated with the idea that the swelling would take a while to resolve and that it would likely take up to a year for her ankle to improve. *Id.*

Consultant Carl Anderson, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment on December 3, 2007. Tr. at 249–56. Dr. Anderson found that Plaintiff was capable of lifting and carrying 50 lbs. occasionally and 25 lbs. frequently; could sit, stand, or walk about 6 hours in an 8 hour workday; and could occasionally climb ladders, ropes, and scaffolds. Tr. at 250–51. He also found that Plaintiff should avoid concentrated exposure to hazards (including machinery and heights), fumes, odors, dusts, gases, and poor ventilation. Tr. at 253. Dr. Anderson indicated that Plaintiff was projected to return to medium duty by February 24, 2008. *Id.*

On December 17, 2007, Dr. Hudson observed cervical spondylosis with radiculopathy and noted that Plaintiff complained of back pain. Tr. at 291. Dr. Hudson refilled Plaintiff's asthma medication, and prescribed Ultram for back pain. *Id.* He noted that she was obese and advised her to quit smoking. *Id.*

At Plaintiff's next appointment, which is undated, Dr. Hudson prescribed Lortab for Plaintiff's cervical spondylosis with radiculopathy. Tr. at 290. Dr. Hudson also indicated that he completed a disability form for Plaintiff's attorney opining that Plaintiff probably could not do even sedentary work. *Id.* Plaintiff was treated on January 25, 2008 for continued back pain and left knee pain. Tr. at 289.

On April 30, 2008, Plaintiff complained of back and neck pain radiating to her shoulders. Tr. at 288. Dr. Hudson noted that Plaintiff's pain was to the point where she was unable to lift, push, pull, or perform fine motor skills with her hands. *Id.* He further noted Plaintiff had been noncompliant with her asthma medication. *Id.* Examination

revealed decreased grip strength bilaterally. *Id.* She was prescribed medications, including Lortab. *Id.*

On August 25, 2008, Plaintiff complained of severe neck pain and Dr. Hudson diagnosed her with cervical radiculopathy. Tr. at 287. Plaintiff indicated that Lortab helped, but wore off too quickly. *Id.* Dr. Hudson prescribed additional medication. *Id.*

An MRI performed on August 28, 2008 revealed right paracentral disc osteophyte complex producing moderate narrowing of the right paramedian canal with slight indentation upon the ventral aspect of the cervical cord at C4-5, and mild narrowing of the canal and neural foramina at C6-7. Tr. at 313–14.

On October 22, 2008, in a questionnaire completed at the request of Plaintiff's attorney, Dr. Hudson stated that if Plaintiff attempted to work on an 8-hour-day, 5-day-per-week basis, she would not be able to perform even sedentary work, and would not be able to perform work that involves anything more than basic one and two-step processes. Tr. at 315. Dr. Hudson indicated that if Plaintiff attempted to work an 8-hour-day, 5-day-per-week basis, she would most probably have to rest away from the work station for significantly more than an hour during the working portion of the work day, would most probably have to miss more than 3 days of work per month, and would have problems with attention and concentration sufficient to frequently interrupt tasks during the working portion of the work day. Tr. at 315–16. Dr. Hudson noted that the diagnoses underlying these limitations were cervical spondylosis with radiculopathy and lumbar

spondylosis and that the diagnoses were based on Plaintiff's recent MRI documenting nerve impingement.  Tr. at 316.

On February 6, 2009, Dr. Hudson completed an application for a disability placard for Plaintiff.  Tr. at 317.  He indicated that Plaintiff had degenerative arthritis of the spine, which was permanent.  *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 14, 2009, Plaintiff testified that she worked until 2006 as vice-president of operations for a mortgage company, which required sitting most of the time and entailed overseeing the loans, including taking the loan applications, reviewing the loan documents, and closing the loans.  Tr. 34–35.  She stated that she subsequently searched unsuccessfully for a part-time job and drew unemployment benefits a couple of times.  Tr. at 36.   Plaintiff also opened a small store with her daughter where she worked from 2:30 to 5:00 most days.  *Id.*  She stated she could not work more than a few hours a day because her back hurt too much and sometimes she would lay on a couch in the back room of the store.  Tr. at 40.  She further testified that her seven-year-old grandson resided with her part time, but that she did not get involved in his care, and that her husband looked after him.  Tr. at 34.

Plaintiff stated that she had back pain and that a spinal fusion in 2005 made the pain worse.  Tr. at 35, 37.  She stated she continues to have "crunching" in her back when

she moves her neck and that her doctor told her she had bone spurs and a pinched nerve. Tr. 35, 37–39.  She also stated she has asthma that is treated with medication.  Tr. at 37, 49.  She said she used her asthma inhaler more when she was working because it was very stressful.  Tr. at 37, 50.  She also stated that she took pain medication that makes her pain tolerable.  Tr. at 49.

She stated she broke her leg in 2007 and has never gotten full use of her leg back since surgery, continues to take pills for the pain, experiences leg spasms, and cannot stand for more than ten minutes.  Tr. at 35, 41–42.  She testified she wears stockings to prevent swelling in her legs, but estimated that her legs would swell after 30 minutes to an hour on her feet if she was not wearing the stockings.  Tr. at 42–43.  She stated she elevates her legs all the time in a recliner.  Tr. at 42.  She estimated she could sit in a chair 45 minutes to an hour before having to adjust by getting up and walking or lying down.  Tr. at 44.

Plaintiff testified that her hands and arms swell mainly in the mornings, but that Bengay helps.  *Id.*  She stated she could not open a jar of pickles, but did not have trouble using a knife and fork.  Tr. at 44–45.  She further stated that she walked with a cane since her car accident, but that Dr. Hudson had recently written her a prescription to allow her to bring her cane into the hearing.  Tr. at 45–46.  She stated she used it 95% of the time, but did not require it so much in her house.  *Id.*

She testified she could drive, grocery shop riding on a cart, carry small grocery bags into the house, and watch television with difficulty focusing.  Tr. at 47–48.  She said

she cooked with her husband, could not completely load the dishwasher, and could not mop the floor without taking two to three breaks. Tr. at 46. She stated she could still think clearly, but cannot focus clearly for long periods of time. Tr. at 48.

### b. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that Plaintiff's PRW as a vice-president of operations for a mortgage company was sedentary work, as typically performed in the national economy. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile with restrictions that limited the hypothetical individual to light work with only occasional use of ladders; frequent use of stairs; frequent balancing, stooping, crouching, kneeling, and crawling; no concentrated exposure to fumes or dusty environments; and no concentrated exposure to dangerous machinery or unprotected heights. Tr. at 52. The VE testified the hypothetical individual could perform Plaintiff's PRW. *Id.* Upon questioning by Plaintiff's counsel, the VE testified that Plaintiff's PRW would be precluded if Plaintiff was limited to performing one- to two-step processes, was off-task more than 15% of the time due to pain, missed three or more days of work per month due to pain, or needed to elevate her feet to waist level four times during the workday. Tr. at 52–53.

### 2. The ALJ's Findings

In her October 21, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since February 24, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, asthma, right leg weakness status post fracture, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ladders; should have no concentrated exposure to fumes or dusty environments; and should have no concentrated exposure to dangerous machinery or unprotected heights.

6. The claimant is capable of performing past relevant work as vice president of operations for a mortgage company. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 24, 2007 through the date of this decision (20 CFR 404.1520(f)).

Tr. at 21–29.

D. Evidence Submitted to the Appeals Council

On request for review, Plaintiff submitted additional records from Dr. Hudson. On October 22, 2008, following Plaintiff's MRI, Dr. Hudson noted that Plaintiff had cervical radiculopathy with impingement at C4-5, but was unable to afford physical therapy or epidural steroid injections. Tr. at 338. He stated that Plaintiff probably could not perform even sedentary work. *Id.*

On February 2, 2009, Dr. Hudson evaluated Plaintiff for right leg spasms and swelling feet. Tr. at 337. He noted that she had worsening pedal edema over the previous months, shortness of breath with exertion, and sporadic muscle spasms in her

right leg.  *Id.*  Dr. Hudson advised Plaintiff to elevate her legs and wear TED hose.  *Id.*
He increased her dose of Lortab to 10mg for her lumbar spondylosis.  *Id.*  She was also
advised to quit smoking.  *Id.*

On March 30, 2009, Plaintiff's edema had improved with wearing hose.  Tr. at
336.  Dr. Hudson indicated that she was using Combivent daily because she could not
afford Symbicort or Advar.  *Id.*  On May 20, 2009, Dr. Hudson treated Plaintiff for
swelling in her feet and a knot on her back and refilled her medications.  Tr. at 335.  On
July 2, 2009, Dr. Hudson saw Plaintiff for follow-up related to her asthma and noted she
must quit smoking.  Tr. at 333.  He also reported that Plaintiff had increased complaints
of low back pain with increased activity.  *Id.*

On September 3, 2009, Dr. Hudson indicated that Plaintiff had diffuse wheezing
and decreased breath sounds.  Tr. at 321.  He diagnosed COPD.  *Id.*

Dr. Hudson treated Plaintiff for depression on November 20, 2009.  Tr. at 320.
She reported severe daily depression with anhedonia (inability to experience pleasure
from activities usually found enjoyable) and insomnia.  *Id.*  Dr. Hudson diagnosed
moderate major depressive disorder and prescribed medication.  *Id.*

On December 17, 2009, Dr. Hudson treated Plaintiff for depression and back pain.
Tr. at 327.  She also had shortness of breath and wheezing.  *Id.*  Spirometry testing
showed moderate airway obstruction.  Tr. at 328.  Dr. Hudson refilled Plaintiff's
prescriptions for Mobic and Lortab, prescribed Prozac, and advised her to quit smoking.
Tr. at 327.

On February 2, 2010, Dr. Hudson executed a statement prepared by Plaintiff's counsel summarizing their discussion regarding his treatment of Plaintiff. Tr. at 323–25. Dr. Hudson stated Plaintiff's continuing complaints of neck pain with radiculopathy in her arms following her 2005 surgery was consistent with the arthritic changes noted on her August 2008 MRI. Tr. at 324. He stated Plaintiff could not afford epidural steroid injections or treatment by a chronic pain specialist because she was uninsured. *Id.* He started Plaintiff on Tramadol in December 2007, which provided some minimal relief from her cervical pain. *Id.* He added Lortab, periodically increasing the dose "due both to her increasing pain and to the effects of this medication wearing off over time." *Id.* Dr. Hudson noted that he had also diagnosed Plaintiff with lumbar spondylosis due to her complaints of low back, but did not work her up for that condition because it was not her primary complaint and would not have changed the treatment plan. *Id.*

Dr. Hudson stated that Plaintiff seemed credible and did not exaggerate her pain behaviors. *Id.* He said the way Plaintiff carried herself and moved when in his office was an indication that she was in severe pain. *Id.* He stated that if he did not indicate neck pain on a particular visit, it did not mean she was not in pain. *Id.* Rather, he did not examine her neck at each visit because it was a chronic problem. *Id.* He noted that Plaintiff's radiculopathy resulting from neck pain was demonstrated by her decreased grip strength at multiple visits. *Id.*

Dr. Hudson discussed Plaintiff's history of severe asthma and noted she could hardly walk down the hallway in his office without losing her breath. *Id.* He opined that

she should be on long-term inhaled steroids, but could not afford that therapy. *Id.* He noted that her spirometry testing numbers were fairly good prior to December 2007 because she had a small airway problem that does not necessarily show up well on spirometry testing. *Id.* He indicated that spirometry testing on December 17, 2007 showed an "FEV1 of 1.68 after inhaler with predicted of 2.78." Tr. at 325.

Dr. Hudson noted that Plaintiff now has COPD secondary to her smoking, but that smoking cessation would not cause her COPD to appreciably improve. *Id.* He stated that she has experienced permanent damage to her lungs. *Id.* He noted that other than smoking, Plaintiff is largely compliant with treatment to the extent she can afford it. *Id.*

Dr. Hudson opined that since at least December 2007, Plaintiff was limited to no more than sedentary work, could stand or walk no more than two hours in an eight-hour work day, could not use her arms or hands more than occasionally, could not lift more than five pounds occasionally, and most probably would have difficulty focusing on even simple tasks. *Id.* This opinion was based on Plaintiff's spirometry testing, MRI findings, and Dr. Hudson's observations of Plaintiff in his office. *Id.*

On May 6, 2010, Dr. Hudson treated Plaintiff for progressively worsening asthma. Tr. at 345. She had shortness of breath and decreased breath sounds. *Id.*

On June 10, 2010, Dr. Hudson saw Plaintiff for a "disability evaluation" related to her depression and moderately-severe asthma. Tr. at 13. He advised her to quit smoking and be compliant with medications. *Id.* Pulmonary function testing on June 24, 2010

revealed severe asthma.  Tr. at 12.  On August 30, 2010, Dr. Hudson evaluated Plaintiff

for a swollen neck, fever, and a sore throat.  Tr. at 8.[1]

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ improperly discounted the opinions of Plaintiff's treating physicians;

2)    The ALJ failed to make a function-by-function assessment in determining Plaintiff's RFC;

3)    New and material evidence submitted to the Appeals Council has not been weight by a factfinder; and

4)    The Appeals Council failed to properly consider the effect of a disability finding in favor of Plaintiff one day following the ALJ's decision.

The Commissioner counters that substantial evidence supports the ALJ's findings

and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

"disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

---

[1] Plaintiff submitted the June and August 2010 records to the Appeals Council on October 4, 2010, but they are not referenced in the Appeals Council exhibit list.  Tr. at 4, 6–15.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the

findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     The New and Material Evidence Submitted to the Appeals Council Requires Remand

The undersigned first addresses Plaintiff's claim related to the alleged new and material evidence she submitted to the Appeals Council because it is impacts the other

issues she raises on appeal. Plaintiff initially argued that the Appeals Council did not properly evaluate the new and material evidence before it. [Entry #16 at 24]. Subsequent to the submission of the parties' briefs in this case, the Fourth Circuit Court of Appeals issued its decision in *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011). The parties thereafter submitted additional briefing on how the *Meyer* holding applies to the present case. Plaintiff argues that the additional evidence submitted to the Appeals Council was new and material and directly addressed the concerns the ALJ expressed regarding Dr. Hudson's opinions. [Entry #25 at 6–7]. Plaintiff further contends that *Meyer* requires remand where the record contains material evidence that has not been weighed by an ALJ or the Appeals Council. *Id.* at 6. The Commissioner argues that the additional evidence was cumulative and unpersuasive and that, because substantial evidence in the record as a whole supports the ALJ's decision, *Meyer* does not require remand. [Entry #28 at 2–3].

Prior to the Fourth Circuit's recent decision in *Meyer*, it was unclear whether an Appeals Council was required to articulate its reasons for denying review of a decision after incorporating additional evidence into the record. In *Meyer*, the Fourth Circuit held that the regulatory scheme does not require the Appeals Council to do anything more than it did in the *Meyer* case—"consider new and material evidence" in deciding whether to grant review. *Id.* at 706. The court reasoned that nothing in the statutes or regulations requires the Appeals Council to articulate its reasoning when "new evidence" is submitted and the Appeals Council denies review. *Id.* at 705–06.

In *Meyer*, the court went on to note:

> Although the regulatory scheme does not require the Appeals Council to articulate any findings when it considers new evidence and denies review, we are certainly mindful that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review." *Martinez*, 444 F.3d at 1207–08; *see also Damato*, 945 F.2d at 989 n. 6 (noting that in "fairness to the party appealing the ALJ's decision, the Appeals Council should articulate its reasoning" when it rejects new material evidence and denies review.).

*Id.* at 706.

In applying these principles to the case before it, the Fourth Circuit observed that as to the new evidence presented to the Appeals Council, "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id.* at 707. For this reason, the *Meyer* court held that the case had to be remanded for further fact-finding because "[a]ssessing the probative value of competing evidence is quintessentially the role of the factfinder." *Id.*

The same considerations that caused the Fourth Circuit to remand *Meyer* are present here. That is to say, the Appeals Council did not err by considering plaintiff's new evidence and not explaining its rationale. However, like the claimant in *Meyer*, Plaintiff presented additional evidence to the Appeals Council, which is now in the record, that no factfinder has attempted to reconcile with conflicting and supporting evidence in the record. Specifically, the additional evidence to the Appeals Council clarifies Dr. Hudson's treatment records and undercuts the ALJ's decision to discount his testimony.

The ALJ gave Dr. Hudson's opinions "little weight" for the following reasons: (1) he opined on issues reserved to the Commissioner; (2) they were inconsistent with the medical evidence and his own treatment notes; (3) they were offered prior to an MRI "which indicated only 'mild' and 'slight' findings"; and (4) there were no treatment notes following Plaintiff's MRI. Tr. at 28.

With respect to the first reason offered by the ALJ, the Commissioner admits that some of the opinions expressed by Dr. Hudson related to Plaintiff's RFC and were "more medically-based." [Entry #17 at 16]. With respect to the third reason, the ALJ was simply mistaken. Dr. Hudson rendered an opinion as to Plaintiff's functional limitations approximately two months following the MRI. Tr. at 315.

The newly-submitted evidence addresses the remaining two reasons cited by the ALJ for discounting Dr. Hudson's opinions. They document Plaintiff's numerous visits to Dr. Hudson following her August 2008 MRI and explain how Dr. Hudson's treatment notes support his opinions regarding Plaintiff's RFC. Specifically, Dr. Hudson stated that he did not always document Plaintiff's neck pain in his treatment notes because it was a chronic problem. Tr. at 324. He indicated that his failure to document neck pain did not mean Plaintiff was not in pain. *Id.* Dr. Hudson opined that based on spirometry testing, MRI findings, and his own observations of Plaintiff, she was limited to no more than sedentary work, could not stand or walk more than two hours in an eight-hour work day, could not use her arms or hands more than occasionally, could not lift more than five pounds occasionally, and most probably would have difficulty focusing on even simple

tasks. *Id.* This opinion directly contradicts the RFC assessment performed by Dr. Anderson and given significant weight by the ALJ. Tr. at 27, 249–56. Dr. Hudson's notes regarding Plaintiff's inability to afford medications and pain treatment are also significant. Tr. at 324, 338.

While the record before the ALJ contained some evidence from Dr. Hudson, remand is warranted because the additional information submitted to the Appeals Council "is more compelling that than which was in the record before the ALJ." *See Neighbors v. Astrue*, No. 8:11-170-JFA, 2012 WL 3096101, at *2 (D.S.C. July 30, 2012). Furthermore, the newly-submitted evidence "contradict[s] evidence in the record upon which the ALJ relied in making his determination that Plaintiff was not disabled." *Creekmore v. Astrue*, No. 5:11-256-RMG, 2012 WL 2874013, at *3 (D.S.C. July 13, 2012). For these reasons, the undersigned recommends remanding this matter for weighing of the evidence submitted to the Appeals Council.

2. Plaintiff's Remaining Arguments

Because this case must be remanded to the Commissioner for the evaluation of the additional evidence submitted to the Appeals Council, the undersigned declines to specifically address Plaintiff's additional allegations of error by the ALJ. However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the additional evidence submitted to the Appeals Council, the court cannot determine that the Commissioner's decision followed the applicable regulations or is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 3, 2012                                  Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).